Argued June 29;  decided October 19, 1896;  rehearing denied.

## CLARNO v. GRAYSON.

(46 Pac. 426.)

1. UNILATERAL CONTRACTS—OPTION TO PURCHASE—CONSIDERATION. —Entering into possession of a mine by an intending purchaser and the expending of money and labor in operating and developing it under the terms of an option to purchase constitute a sufficient consideration to support the option, and render it irrevocable within the time limited for completing the purchase (*Stinson* v. *Hardy*, 27 Or. 584, cited and followed), and it is no objection that the option is unilateral:  *House* v. *Jackson*, 24 Or. 89, cited and followed.

2. TIME AS A NECESSARY ELEMENT IN AN OPTION—VENDOR AND PURCHASER.—It would seem that if a given condition is a prerequisite to the acquirement of a right to the subject matter of a contract, time ought to be considered of the essence of such a contract, if the performance of the condition is a matter  optional with the purchaser, and the contract has been fairly entered into with a view to accord an option only.

3. SPECIFIC PERFORMANCE—WAIVER OF CONDITION PRECEDENT.— Acts or declarations on the part of the owner which amount to a rescission or repudiation of an option for the purchase of land, and an absolute and positive denial of any and all duties under it, may render unnecessary strict performance by the purchaser before suit to secure specific performance, upon the ground that it would be a useless and vain thing to tender the stipulated performance, knowing that it would not be accepted.

4. SPECIFIC PERFORMANCE OF OPTION.—An owner of land who would insist upon strict performance by a prospective purchaser as a condition precedent to an action by the latter for the specific performance of an option to purchase must not himself be the cause of the breach.

5. VENDOR AND PURCHASER—ABANDONMENT OF OPTION.—The mere executing of a general assignment for creditors by the holder of an option to purchase real estate will not be considered as an abandonment of the right to complete the transaction, where the assignment was resorted to for the purpose of dissolving attachments that were impeding the completion of the purchase, and the individual stockholders were ready to support the assignee in carrying out the terms.

6. TENDER—SPECIFIC PERFORMANCE.—Where the giver of an option on real estate enters and takes possession of the property before the expiration of the time limited in the option, and in violation of its terms, his conduct will not be considered such a repudiation of the option as to excuse a tender under the provisions of the contract, where it is mutually understood that the holders of the option may complete the purchase as stipulated; such conduct by the maker of the contract may excuse punctuality of performance, but will not excuse performance entirely.

| 30 | 111 |
| 34 | 57 |
| 30 | 111 |
| 36 | 456 |
| 30 | 111 |
| 43 | 304 |
| 30 | 111 |
| 44 | 478 |

7. IDEM.—The giver of an option to purchase real estate took possession of the premises in violation of the option he had given, and during his holding derived a profit from it. The holder of the option sued for specific performance, but made no tender of the purchase price, claiming that the defendant had made more profit during his wrongful possession than the amount due on the bond. *Held,* that in the absence of an accounting, or a refusal to account, the purchase price must be tendered as a condition precedent.

8. PLEADING WILLINGNESS TO PERFORM—SPECIFIC PERFORMANCE.— In a suit to enforce the terms of a contract to sell, an allegation that plaintiff stands "ready, willing, and waiting to perform" is insufficient; the tender should be to do all the things and comply with all the conditions necessary to complete the acquisition of the rights claimed.

9. EQUITY JURISDICTION—SPECIFIC PERFORMANCE.—In a suit for specific performance by the holder of an option to purchase a mine in operation an equity court cannot decree that plaintiff be put in possession and that the time for purchasing be extended for a period equal to the time the property has been withheld by the wrongful act of the vendor, because it would be making a new and different contract, and because it would require a protracted supervision over a complicated and technical matter.

From Baker:  ROBERT EAKIN, Judge.

This is a suit by Francis Clarno, as assignee of the Virtue Mining Company, a private corporation, against George W. Grayson, and it is based upon a certain contract and its modifications touching the Virtue Mine, situated in Baker County, Oregon. On the 19th day of November, 1891, the defendant, Geo. W. Grayson, being the owner of the mine in question, entered into a contract under seal with one William C. Ralston, of San Francisco, California, wherein, for the consideration of $10 in hand paid, the said Grayson agreed "to give to the said party of the second part (Ralston) a working bond on the aforesaid mining claim, with the privilege of purchasing said claim on the following conditions:  (1) The said party of the second part shall be allowed, on the signing of this agreement, without payment, to enter into full possession of said mining claim, for the purpose of working and developing the same, and extracting ores; provided, however, that all such development work must be done in a proper,

workmanlike manner, and not to the injury of said mine, or to the interest of the party of the first part; and provided, further, that the party of the second part must post notices necessary, according to law, to hold the said party of the first part free from the payment of any expenses or costs which the said party of the second part may incur during his working of said mine. (2) If, within one year and twelve days from the date of this agreement (to wit: the 1st day of December, A. D. 1892), the said party of the second part shall pay to the said party of the first part the sum of forty-five thousand ($45,000) dollars, legal coin of the United States, then and on that condition the said party of the first part agrees to deliver to said party of the second part a good and sufficient deed, conveying the said mining property to the said party of the second part." The third paragraph is superseded by paragraph 4 of the modified contract, and hence is omitted. "(4) If, within a year and twelve days from the date of this agreement (to wit: the 1st day of December, 1892), the said party of the second part does not pay to the said party of the first part said sum of forty-five thousand ($45,000) dollars, legal coin of the United States, then this agreement to be null and void and of no effect. Time is of the essence of this agreement." Then, after giving a description of the mine, the contract proceeds: "Together with all the dips, spurs, and angles, etc., and also all and singular the tenements, hereditaments, and appurtenances thereunto belonging. Also the hoisting works and improvements connected therewith; and also all that certain twenty-stamp-power quartz mill situate on the aforesaid Virtue Mine."

Subsequently this contract was assigned by Ralston to A. V. Oliver, and by his and mesne assignments became the property of a corporation of Stockton, California, known as the Virtue Mining, Milling & Development

Company; all with the written assent of Grayson. The Stockton company entered into possession of the mine, and expended a considerable sum of money in equipment and development work, and on August 16, 1892, entered into a modified agreement with Grayson as follows, omitting preamble: "Now, therefore, in consideration of the premises, and of a valuable consideration given by the party of the second part to the party of the first part, the party of the first part agrees to extend the time on said bond nine (9) months, to wit: the 1st day of September, 1893, under the following conditions, to wit: (1) It is agreed and understood that all the conditions, except the limitation of time, named in the original bond between George W. Grayson and William C. Ralston (reference being had thereto), shall remain in force until the 1st day of September, 1893; said original agreement, to which reference is had, being dated November 18, 1891, and together with all its assignments and transfers, duly signed and acknowledged, being of record in the records of Baker County, Oregon, in Book of Deeds, volume U, page 268. (2) It is further agreed and understood that in case the said party of the second part should not complete the purchase of said mine in accordance with condition No. 2 of the said original agreement, then and in that event it is expressly agreed and understood that any bills, mining, or hoisting works, and all improvements of every kind soever, erected and used by the said party of the second part in connection with the working or developing of said mine, shall become absolutely the property of the party of the first part. (3) It is further agreed and understood that condition No. 3 of said original agreement be cancelled. (4) It is further agreed and understood that the net proceeds, if any there be, of all the ores extracted from said mine or removed from the dump belonging to the said mine, during the existence of this agreement,

after deducting all costs incidental to mining and milling the same, and extracting the gold therefrom, shall be turned over monthly, on the 15th day of each month, to the party of the first part, or his agent. Should the purchase be completed in accordance with the conditions of this agreement, to wit: by the payment of forty-five thousand ($45,000) dollars on or before the 1st day of September, 1893, then and in that event the said party of the first part agrees to consider the amounts so received, if any there be, as part of the purchase price; but should the purchase not be completed by the payment of forty-five thousand ($45,000) dollars on or before September 1, 1893, then and in that event it is fully agreed and understood that any and all of these amounts so received by the party of the first part, from the net receipt of all such ores extracted or worked from the mine or dump of said property by the said party of the second part, shall belong absolutely to the said party of the first part, without recourse, and the said party of the second part hereby waives all claim to the same. And it is further agreed that the expenses above referred to as incidental to mining and milling of said ores shall be reasonable, and to the satisfaction of the said party of the first part, and that at the end of each month the said party of the second part shall render to the said party of the first part, or his agent, a full and exact statement of all the ores extracted from said mine during said month, with complete detailed statement of the workings of the same. And it is further agreed and understood that at any time during the existence of this agreement the party of the first part, or his agent, may at any time have full access to the said property, and to the books of the corporation, for the purpose of examining the same and verifying any accounts. (5) It is further understood and agreed that if the said party of the second part should fail to turn over monthly on the

15th day of each and every month to the party of the
first part, or his agent, the net proceeds of all the ores
extracted from said mine, or removed from the dump
belonging to said mine, or shall fail to work said mine for
any period of sixty (60) days, or shall fail to pay said
sum of forty-five thousand ($45,000) dollars, as provided,
on or before the 1st day of September, 1893, or shall at
any time during the continuance of this agreement re-
move, or attempt to remove, any of the improvements
whatsoever erected or used by the said party of the sec-
ond part in connection with the working and developing
of said mine, or should refuse the party of the first part, or
his agent, access to the said property, or to the books of
the said party of the second part, for the purpose of
examining the same and verifying any accounts of the
party of the second part, or shall fail to perform any of
the conditions or provisions of the said bond or of this
agreement, as therein and herein provided, then this agree-
ment shall immediately terminate and end, and the party
of the first part shall be entitled, without notice and with-
out demand, to take immediate possession of all the prop-
erty agreed to be sold under said bond, and under this
agreement. This agreement is executed in duplicate.
Time is of the essence of this agreement."

The complaint, after setting out the contract, its
modification and transfers, shows that subsequent to the
modification it was transferred by the Stockton company
and mesne assignments to the Virtue Mining Company,
a corporation having its principal place of business at
Portland, Oregon, and that said last-named company took
possession of the mine, and, at great expense for ma-
chinery and labor, equipped, worked, and developed the
same, all which was incurred in good faith; that the
defendant, about June 9, 1893, wickedly, fraudulently,
and unlawfully, and without color of right or authority,

ousted the said Virtue Mining Company, and took posses-
sion of said mine, with all its appurtenances and improve-
ments, and has ever since unlawfully withheld the same
from said company and plaintiff, although possession has
been repeatedly demanded of him; that he so entered into
the possession of said mine with the purpose and intent
to hinder and delay the company in the operation thereof,
and prevent it from paying the price agreed upon for its
purchase on the 1st day of September, 1893, and has
so prevented it, as otherwise it would and could have
made such payment at the appointed time; that defend-
ant has, since he took possession, extracted from said
mine gold bullion to the value of $75,000, and has dam-
aged the plaintiff in the further sum of $48,000, by pre-
venting it from operating said mine and running the mills
and machinery to their full capacity.    The company
assigned all its property about May 29, 1893, for the ben-
efit of its creditors, and the plaintiff was appointed
assignee.    The facts touching the assignment are shown,
and it is then further alleged "that he (plaintiff) is ready,
willing, and waiting to perform said contract on the part
of said corporation,"    *    *    *    and that "he does not
tender the said balance of purchase price because Grayson,
prior to the expiration of said contract, had taken vastly
more out of said mine, in gold bullion, than the amount
thereof, and he now holds the same, and refuses to turn
any part of it over to the plaintiff, or to account for it in
any way; that he is also justly indebted by said damages
in a sum much larger than said balance; that he is a resi-
dent of the State of California, and is now insolvent, and
plaintiff could not collect from him said sums or either of
them if recovered as damages."    The issues tendered by
the answer are:    First, the right of the Virtue Mining
Company, under the contract, to assign to Clarno without
the assent of Grayson;    second, whether said company, on

or about the 1st of June, 1893, abandoned and forfeited the right to the possession, and to work and operate the mine, by reason of certain alleged acts, such as attempting to place plaintiff, a stranger to said contract, in possession without the consent of Grayson; failing and refusing to prosecute development work in a proper and workmanlike manner, or to extract ore as provided by the contract, or to account for and turn over the net proceeds, by not making the operating expenses reasonable, by failing to render a monthly statement of all ores extracted, with a detailed statement of the operation of said mine, and by refusing to turn over such proceeds to defendant on the 15th day of each month; and, third, whether plaintiff has lost the right or privilege accorded by the contract of purchasing the mine by reason of the alleged failure to tender or pay the purchase price of $45,000 on or before September 1, 1893. · Decree for defendant, and plaintiff appeals.

AFFIRMED.

For appellant there was a brief and an oral argument by *Messrs. Dell Stuart* and *Thos. O'Day.*

For respondent there was a brief and an oral argument by *Messrs. T. Calvin Hyde, F. L. Moore,* and *Robert M. Clarke.*

MR. JUSTICE WOLVERTON, after stating the facts in the foregoing language, delivered the opinion of the court:

1. We had occasion to construe a contract similar to the one under consideration in *Stinson* v. *Hardy,* 27 Or. 584, 594 (41 Pac. 116), wherein it was determined that, after taking possession, making improvements, and incurring expenditures, the second party acquired a license coupled with an interest, exclusive and irrevocable. By

the terms of the contract under consideration, and when we speak of the contract we have reference to it in its changed condition, as it is conceded by the parties that it has been regularly modified, it is conditioned that the party of the second part shall be allowed, on signing the agreement, without payment, to enter into full possession of said mining claim for the purpose of working and developing the same and extracting ores, with a proviso, followed by the conditions upon which the work of development and the extraction of ores shall be carried on or prosecuted. The contract contemplates the expenditure of labor and money by the second party, and when entry was made thereunder, and such expenditures incurred, it became a license coupled with an interest, exclusive in the second party, and irrevocable, except under the express conditions following the proviso, so that possession could be maintained by the second party by observance of its provisions throughout the entire limitations of the contract. Coupled with this license, the second party is granted the privilege of purchasing the mine for $45,000, payable on or before the 1st day of September, 1893. Provision is made whereby the net proceeds, if any, arising from the operation of the mine, should be paid to the first party, and, in the event of the purchase being consummated on or before September 1, 1893, such proceeds were to be considered as part of the purchase price; but it is further conditioned that in the event the $45,000 was not paid on or before the date named, such net proceeds as were thus received by said first party should belong to him absolutely, and all claim thereto waived by the second party. When he assumed to operate the mine, the said second party was required to observe the conditions prescribed by the contract as to the manner in which he should proceed, or by disregarding them incur the risk of terminating the agreement. The conditions of the con-

tract did not obligate him to pay the $45,000 named as the consideration for the mine, or any part of it. It was left optional with him to consummate the purchase or not, as he might elect. The contract, therefore, is in that respect unilateral, as it is binding in the one direction only. The entry and outlay of labor and money in operating the mine, especially as it is stipulated in the contract that in case the purchase was not completed all improvements made should become the property of the first party, constituted a sufficient consideration to support the option, and rendered it irrevocable within the time limited: *House* v. *Jackson*, 24 Or. 89 (32 Pac. 1027); *Hall* v. *Center*, 40 Cal. 63; *De Rutte* v. *Muldrow*, 16 Cal. 513; *Willard* v. *Taylor*, 75 U. S. 557; *Corson* v. *Mulvaney*, 49 Pa. St. 98 (88 Am. Dec. 485); *Schroeder* v. *Gemeinder*, 10 Nev. 355; *Souffrain* v. *McDonald*, 27 Ind. 269; Pomeroy's Specific Performance of Contracts, § 169 and note. To this point there is but little difficulty.

2. By its terms, time is expressly made of the essence of the contract, but, notwithstanding, it seems to be contended that, treated and considered as an equitable proposition, in reality it is not; that possession having been given, and large expenditures of labor and money having been made by the contemplated purchaser upon the faith of the contractual relations, the time-essence clause is thereby made to stand as a dead letter, which equity will not enforce. It was perfectly competent for the parties to introduce such a stipulation, and they must be held to be bound by it, whatsoever may be its legitimate effect, either at law or in equity. It was early intimated by Lord Thurlow, in *Gregson* v. *Riddle* (cited in *Seton* v. *Slade*, 7 Ves. 268), that time could not, in equity, be made of the essence of a contract, even by positive stipulations; but this idea never came to be judicially established, and it is now firmly settled that time may become of the essence

of the contract in several ways: By stipulation of the parties, by the nature of the subject-matter of the contract, and, where not originally essential, by delay upon the one side, and reasonable notice upon the other, to complete: Pomeroy's Specific Performance of Contracts, § 382. And by one line of decisions it is held that time is of necessity an essential element in all unilateral contracts, but another line asserts that, while it is material in such contracts, it is not strictly essential: Id., § 387. It is somewhat difficult, and perhaps impossible, to harmonize the discordant opinions relating to the effect of such contracts, and whether or not time is inherently and necessarily an essential ingredient. Mr. Pomeroy attempts to reconcile the conflict by the following suggestions: "Where the contract is really an offer on one side, with a provision that this offer must be assented to and accepted, when a mere acceptance is contemplated, or payment must be made, when payment was the act of acceptance contemplated, at or before a specified date, then, of course, the act of assent or of payment must be done within the prescribed time, and time is from the very form of the contract essential." "If, however, the offer or option * * * is not made to depend upon an acceptance or payment at or before any particular or specified day, but simply calls for an assent and acceptance, or for a payment, as the case may be, and is silent with respect to the time within which such acceptance or payment must be made, then, so long as the offer remains unrevoked, it is enough that the acceptance or the payment be made within a reasonable time." In such a case time is material only, and not in the true sense essential: Pomeroy's Specific Performance of Contracts, §§ 387, 388.

Mr. Freeman, in his note to *Wells* v. *Smith*, 31 Am. Dec. 278, suggests that the cases could be harmonized by establishing the rule "that if the performance of an

act at a time stated be made by the contract a condition precedent to the acquisition of any right thereunder, then that time is of the essence of the contract. * * * If, on the other hand, some right has already been acquired under the contract, as where part of the purchase price has been paid, or the purchaser has taken possession with the assent of the vendor, and made permanent and valuable improvements, any provision looking to the forfeiture of the contract will be treated as a condition subsequent, and relieved against, if its enforcement be shown to be inequitable." In support of the rule, the learned annotator cites 2 Leading Cases in Equity, 1134, wherein is found White & Tudor's notes to *Seton* v. *Slade*, reported 7 Ves. 265. They say: "It may be inferred from the authorities which have been cited that where the intention manifestly is that payment, or the conveyance of a good and sufficient title, at or before a certain time, shall be a prerequisite without which no right shall vest under the contract, a chancellor cannot make a new agreement for the parties by holding a subsequent tender equivalent to the punctual performance which they have prescribed. Under these circumstances, the case falls within the rule that an executory agreement fails utterly if it be not exactly fulfilled. When, on the other hand, the effect of the contract is to vest an immediate right in the purchaser, which would descend to his heirs, or pass under a general or residuary devise, relief may be given against a subsequent default, which is not willful or injurious." The right which Mr. Freeman refers to as having vested is much broader in its significance than the right Messrs. White and Tudor speak of, such as "would descend to the heirs or pass under a general or residuary devise." The latter evidently restricts the right which must vest by the contract, and which will excuse punctuality to lands or reality, a right in rem, while Mr. Freeman's idea of it

seems to comprehend any right, including such as might be acquired by the contract, regardless of a right in the thing itself. The distinction would appear to be significant. If the contract is such that an equitable conversion has taken place under it, so that equity will regard that as done which ought to be done, then a right in the property has vested, and the case ought to present clear and satisfactory countervailing equities in which a court would declare a forfeiture. But if the right acquired by the terms of the contract is simply a privilege or an option, or a right to acquire a right, or an interest in the subject-matter of the contract, it is then not a question of the forfeiture of any vested right in the property, or a divestiture of title, whether termed equitable or legal, but a question of the enforcement or non-enforcement of a stipulated personal right or privilege. The privilege of acquiring a vested equitable right must be distinguished from the right. The privilege is acquired directly by the contract, but the acquisition of the right, while it is stipulated for under its terms, is dependent upon the performance of a condition. When such a condition is performed, the right vests, and not until then: *Richardson* v. *Hardwick*, 106 U. S. 254 (1 Sup. Ct. 213).

Now, it would seem that if the performance of a certain condition, such as acceptance of an offer or the payment of a sum of money at or within a certain time, which acceptance or payment is a matter purely optional with the purchaser, is a prerequisite to the acquirement of a right to the subject-matter of the contract, time ought to be considered of the essence of such a contract. Until such a performance, there is not a meeting of minds that the property shall be transferred. The purchaser has not consented to take, nor the vendor to convey. The act to be done is the very thing needful to a consummation of the agreement. It is the special manner indicated for

expressing assent, and the law will not compel an assent. There must be an agreement, without which the law is powerless. He whose duty it is to assent to a condition within a given time, if he would obtain a right, should be held to punctuality in performance, as it would be inequitable to the party whose property rights are dependent upon such an act to be held to a performance for an indefinite length of time, notwithstanding a specific date is agreed upon within which the assent shall be made manifest: *Bullock* v. *Adams' Executors*, 20 N. J. Eq. 371-374. A mere offer to sell land at a given price within a stated time, if accepted, will constitute a contract, the specific performance of which may be enforced in equity: *Boston & Maine R. R.* v. *Bartlett*, 3 Cush. 224; *Perkins* v. *Hadsell*, 50 Ill. 216; *Smith & Fleek's Appeal*, 69 Pa. St. 475. It may, however, be retracted at any time before acceptance. It cannot be contended that such an offer, without an acceptance, will vest an equitable interest in the land in the contemplated purchaser. Now, if we go a step further, and consider an offer based upon a sufficient consideration, with an option to purchase within a given time, the offer cannot be withdrawn within the time. It must remain open until the day for performance by the contemplated purchaser has come and gone; but unless the offer be accepted, or the price paid, that is, the condition be performed upon which the option is granted, is there any greater or more cogent reason why an equitable interest should vest prior to performance in the latter case than in the former? It would seem not. So long as the consideration named is the price of the option, and not to be deemed a part payment for the property unless the offer is accepted in the manner agreed upon, it seems clear that no equitable right could vest. There may be, and perhaps are, instances in which the consideration to support the option is so grossly in excess of its value that the court

may construe the contract as evincing an intention of the parties to accord a present right to the purchaser in the subject-matter, or the party bound may, by encouraging large expenditures, be deemed to have waived strict performance. In such instances provisions looking to a forfeiture might be treated as conditions subsequent, and relieved against, as it would be inequitable not to do so: *O'Fallon* v. *Kennerly*, 45 Mo. 127. Where, however, the contract is fairly entered into with a view to accord an option only, the stipulated condition for asserting the option must be complied with before there can be mutuality in a contract for the purchase of land, and must be deemed a condition precedent to the vesting of an equitable interest in the subject-matter, and time becomes an essential element, as it is evident that the parties intended it as such. It is said that when the option has been declared, it takes effect as an equitable conversion, by relation back to the date of the original contract: *Kerr* v. *Day*, 14 Pa. St. 112 (54 Am. Dec. 526); *Ripley* v. *Waterworth*, 7 Ves. 436; 3 Pomeroy's Equity Jurisprudence, § 1163. But it has been held that this doctrine of relation does not apply as between vendor and purchaser: *Edwards* v. *West*, 7 Ch. Div. 863. At any rate, there can be no vested interest until the option is declared, whether it relates back or takes effect from the date of performance of the condition. We have discussed this matter much at length because of the fact that a great deal of stress, both in the argument and the briefs, has been laid upon the question whether time was, in effect, the essence of the contract, and, if so determined, whether it had not been waived, and the discussion, we trust, has not been without profit. It is not a question here whether time is of the essense, as all the acts relied upon as constituting a sufficient performance under the circumstances of the case have been performed, or an alleged adequate

performance proffered, and suit instituted prior to the expiration of the stipulated time in which the company might have exercised its option to purchase.

3.   The question now before us is one of performance, and whether exact, not punctual, performance has been excused.   Much that has been said relative to the necessity for the performance of a condition precedent within the time, where made essential, has application to the quality of the performance which will require a specific performance by the party granting the option.   As indicative of the company's desire to purchase under its privilege or option, it was required to perform a condition precedent, that is, to pay $45,000.   No equitable or other estate passed to it in this mine without such performance, unless it was excused by the acts of the defendant, as it could not be compelled to purchase without its assent. Or, as expressed by Mr. Pomeroy, "Where the contract is thus conditional, that is, where it rests upon a condition precedent, until the performance of the condition it cannot be enforced, because until that time there is no true contract."   Pomeroy's Specific Performance of Contracts, § 334.   It may be said to be well settled that such acts or declarations as amount to a rescission or repudiation of the contract, and an absolute and positive denial of any and all duties under it, may render strict performance before suit unnecessary, upon the ground that it would be a useless and a vain thing to tender the stipulated performance, knowing that it would not be accepted.   The denial of the right to make the tender, or the positive and unqualified assertion by the party who may insist upon punctuality or exact performance that thenceforth he is not bound—and this state of affairs may be inferred from unequivocal acts as well as direct assertion—is, in effect, a waiver of strict performance, and a notice that the other party may as well proceed in due time to the enforcement

of the obligation, as otherwise no performance could be obtained at his hands: *Brock* v. *Hidy*, 13 Ohio St. 306; *White* v. *Dobson*, 17 Gratt. 262; *Maughlin* v. *Perry*, 35 Md. 352; *Deichmann* v. *Deichmann*, 49 Mo. 107; *Lowe* v. *Harwood*, 139 Mass. 133 (29 N. E. 538); *Gray* v. *Daugherty*, 25 Cal. 266; *Baumann* v. *Pinckney*, 118 N. Y. 604 (23 N. E. 916); *Brown* v. *Eaton*, 21 Minn. 409; *Mattocks* v. *Young*, 66 Me. 459; *Dulin* v. *Prince*, 124 Ill. 76 (16 N. E. 242); *Mansfield* v. *Hodgdon*, 147 Mass. 304 (17 N. E. 544).

4. Another proposition insisted upon, which is sound in law and based upon good morals, is that he who would insist upon strict performance must himself not be the cause of the breach. His own wrong can never operate under the sanction of law to his advantage, nor to the injury of another. This may be regarded as fundamental, and no authorities are necessary to support it.

Having premised this much of what seems to be the law touching a construction of the contract under consideration, and the rights and duties of the parties thereto, we will examine the facts as they appear to us to be exhibited from the evidence in the record. By reason of the great volume of the testimony, we can do scarcely more than to state our conclusions without any very extended reference thereto. Prior to December, 1892, the Virtue Mining, Milling & Development Company, of Stockton, California, known herein as the Stockton company, and its predecessors in interest, under the contract with Grayson, had incurred a large indebtedness, which was outstanding in the way of divers demands against the company and its assignors. For some reason, which is not disclosed in the evidence, Grayson had resumed possession of the mine, with its mills, pumping apparatus, and appurtenances. At any rate, he was in the sole possession when he consented, a little later, that the Virtue Mining Company of Portland, Oregon, should enter and assume con-

trol. On December 9, 1893, the Stockton company, by deed, duly assigned its interest in the contract, mine, and appurtenances to one L. M. Robinson, and he, on the 12th, to David Ogilvy, who was then one of the promoters and afterwards president of the Portland company. He with others at the time had in contemplation the incorporation and organization of the company last named, and, as a means of transferring said contract and the interest thereby obtained in the mine, to the company, the deed was made to Ogilvy, for the time being in trust for said promoters, and the company when organized. The company was afterwards, on January 10, 1893, duly incorporated, and in due time organized by its promoters; and on the 9th day of April, 1893, Ogilvy, by deed, assigned to it, as designed by those concerned. As a consideration for the assignment to the promoters of the Portland company, they agreed to pay about $18,000 of the indebtedness that had been incurred under the contract, and, having thus become interested in the contract, they applied to Grayson for his consent to the assignment, and that they be installed in possession of the mine. The agreement may have been conditional upon their obtaining Grayson's consent, but it is of little importance whether conditional or absolute. Grayson was induced to go to Portland during the last days of December, and at that time consented to the transfer, and gave an order upon Geo. W. Boreman, who was then his agent at Baker City, Oregon, who, later on, about January 6, 1893, put them in possession. Grayson says the conditions upon which he gave his consent were that they would pump the water out of the mine, pay off the old claims, free the mine of attachments and other liens, put up a working capital of from $20,000 to $30,000, to meet all liabilities, and work the mine in accordance with the stipulations of the contract, all which was agreed to by the promoters of the

Portland company. It was contended by Grayson's coun-
sel at the hearing that this alleged agreement modified
the original contract, and that a failure of said promoters
and the company to comply therewith operated as a for-
feiture of their rights and privileges under the contract;
but no such modification is pleaded, nor is there any
assignment of a breach of these alleged new conditions,
so that any available breach must be sought for under the
original contract, and the modification of August 16, 1892.
The promoters deny this alleged agreement, but this
much is established: They were to free the mine of water,
and otherwise operate it as the contract directed. It was
also understood that if at any time they should conclude
to abandon the mine, Grayson should be notified so that
he might take hold of it at once and prevent it from again
filling with water.

Some talk was had as to who should superintend the
operation of the mine, Grayson insisting upon the employ-
ment of Geo. W. Boreman. N. S. Wight, however, one
of the promoters of the Portland company, was appointed,
and took charge, when possession of the mine was ob-
tained, and Boreman became foreman under him. Wight
continued to act as superintendent until about March 23,
1893, when he resigned, and severed his relations with the
company, whereupon Boreman was appointed as his suc-
cessor, and the latter continued in the office while the
company had the management. During all this time,
George Walker, who was one of the stockholders and
one of the original promoters of the company, had a gen-
eral oversight of the mining operations, he being present
in person during the whole time up to May 26, except
perhaps ten days in March. He was the direct representa-
tive of the company on the ground, for the purpose of
protecting and promoting its interests. On May 26, while
the mine was in full operation, some of the mining ma-

chinery was attached in an action begun against the Portland company, presumably upon some of the demands of the old Stockton company. Boreman was put in charge by the sheriff as keeper, but the working of the mine was not thereby impeded. At about the same time Walker attempted to encumber the mills and machinery with a chattel mortgage, but his authority for so doing was denied by the company. Walker went immediately to Portland, leaving Boreman in charge, and the company, upon being apprised by him of the condition of affairs at the mine, determined, by resolution duly adopted by its board of directors at a called meeting on May 29, to make a general assignment for the benefit of its creditors. In pursuance of the resolution, a deed of assignment was made to Francis Clarno, of Portland, the plaintiff herein, which appears to have been acknowledged, and the schedule and list of creditors sworn to, on June 1. The contract with Grayson is scheduled as the only property of the company, and is valued at $20,000; the liabilities are shown to be $17,498.77. The deed was filed for record in Multnomah County June 2, and in Baker County on the 3d. No undertaking was entered into, executed, or filed by the assignee until August 26, 1893. Clarno went from Portland to Baker City, arriving there in the forenoon of June 3, and at once notified Boreman of his authority in the premises, and his purpose to take possession of the mine. Boreman at once telegraphed the situation to Grayson, who was then in Oakland, California. Late in the afternoon Boreman went with Clarno to the mine, presumably for the purpose of turning the same over to him, but when they arrived they found the miners had taken forcible possession. A committee had been appointed by them to take control of its operation, and they refused to give Clarno possession, or to recognize the authority of Boreman. I. H. McCord, Boreman's bookkeeper, preceded Clarno

and Boreman to the mine, and, it is claimed, got the miners drunk, and incited them to mutiny against the company and its assignee; but it is not clear from the testimony that such was the case, although McCord was himself drunk, and had a personal encounter with one or more of the men. Grayson, in reply to Boreman's dispatch, sent him the following telegram from Oakland in the afternoon of the same day, which was received at Baker City at ten minutes to seven that evening: "Follow attorney's advice, keep water pumped out; leave for Portland tonight." It appears that prior to, and perhaps at this time, Hon. T. C. Hyde was Grayson's counsel at Baker City.

Grayson arrived at Portland on the 5th, and at once called on Mr. G. Heitkemper, secretary of the Portland company, with reference to the condition of affairs at Baker City and the mine, and a conference of some of the directors and stockholders, and their attorney, Judge Dell Stuart, was arranged and had with Grayson, at which it appears that he was apprised of the fact that they had information from Baker City that Boreman was holding the mine for him, and in pursuance of his direction. Grayson denied that Boreman had any authority for so doing, but declined their request for an order upon Boreman to surrender the mine to them, saying, in effect, that he did not know the condition of affairs; that he would no nothing until he went to Baker and learned the situation, and that he would then make things right. The condition of the company, and the reason for the assignment, was discussed. Grayson went on to Baker City, arriving there on the 6th, and a conference was had with Clarno. Touching what was said at this conference there is conflict in the testimony. Clarno claims he demanded possession of the mine from Grayson, and the latter denies that any direct demand was made, but says the matter was talked

over between them, and that he told Clarno he was not in a position to surrender possession, as the miners were holding it, and that it was useless for him to try to act until they were satisfied. Another meeting was appointed for the following day, but Clarno left for Portland in the evening, and no further consultation was had between them. Afterwards Grayson attempted to get possession from the miners, but they refused to surrender until they had taken out enough gold to pay themselves; but finally they agreed to cease operations on the 11th, and did at midnight of that day leave off the extraction of ore from the mine. On the 12th they cleaned up the mill, secured the bullion, and on the 14th the fund of fifty-four hundred and odd dollars derived therefrom was distributed through the committee's direction among the miners pro rata, in proportion to their several claims against the company up to the time of their taking possession, the fund paying ninety-four per cent. of their respective demands. By direction of the committee, the checks were drawn by Boreman in their behalf. Grayson assumed possession on or about the 14th. In the meantime the pumps had been kept running through his direction, he becoming responsible for the expenses thereof. On the 17th, Grayson wrote to the secretary of the Portland company: "You have forfeited your rights under the bond I gave to the Virtue Mining, Milling & Development Company, under which you were operating said mine, and abandoned it to your creditors. I have taken hold of the property as my right under the bond." On June 30, the attorney, signing both for the company and its assignee, wrote Grayson at Baker City: "Mr. Heitkemper finds your letter on his return from Chicago, and gave it to me to answer. The property of the company, as you well know, was not abandoned to its creditors, or any one else. Your right or authority to take possession of it, its proceeds or earn-

ings, is denied.  The assignee demands the mine and its proceeds and earnings from you; also the twenty-stamp mill which you still fail to deliver."  Grayson claims to have never received this letter.  On July 13 he again wrote from San Francisco to the president of the company, saying, among other things:  "When I was in Portland, in June, your secretary stated that you had so far had a hard time, and spent a large sum of money, and in view of that I should be as lenient as I could in enforcing the bond under which you were working.  Your only hope then seemed to be that you might sell to some one, and get your money back.  I have not at any time desired to prevent you from selling, so that you might reimburse yourself, and will not now stand in your way between this and September."

After Grayson took charge the mine was cleaned up, and what water remained was pumped out, and to some extent it was operated by the extraction of ore and milling the same, under Boreman's supervision, he acting for Grayson until near the 1st of August.  In the latter part of July a rich pocket was discovered, and Grayson again visited the mine.  While there on this occasion, Mr. Heitkemper and Judge Stuart went from Portland to see him, and Mr. Heitkemper testifies that Judge Stuart, in behalf of the assignee, made a positive demand of Grayson for a surrender of the possession of the mine.  Grayson denies the demand sub modo, although he admits it was talked about.  Stuart remained but a short time, but Heitkemper stayed for several days.  During the time that one or both these parties were on the ground, Mr. J. McNally, a miner of large experience, and with whom Grayson had been in correspondence, came to Baker City, and, while Heitkemper was still there, assumed the supervision of the mine in the place of Boreman.  Grayson testifies that it was by virtue of an understanding between

him and Heitkemper that he was put in charge, but Heit-
kemper denies this, and McNally says that Grayson and
Heitkemper employed him to take charge. McNally had
not been at the mine at the time, and when he went for
the first time, Heitkemper and Grayson went with him.
Heitkemper says, in this connection: "I was still nego-
tiating with some parties in Chicago who wanted to buy
the mine, and he (McNally) wrote me a very nice letter
that I could show so I might still sell the mine. Q. You
thought you might make the sale? A. Yes, sir; because
Mr. Grayson said if I could sell the mine he would have no
objections, but he would not let us run it, or would not
let us have possession of it." Heitkemper waited over
several days, expecting a party from Chicago, whom it
was intended should inspect the mine with a view to pur-
chasing. As touching Grayson's willingness to allow the
purchase under the contract, Clarno, in giving an account
of his conference with him on June 6, says: "He (Gray-
son) stated that if they were able to pay him $45,000, he
would surrender the mine; that he did not want the prop-
erty; that he had other mines; that he was getting old,
and it was a long way from home; and that if they would
pay him $45,000 he was willing to give up the mine."
Grayson testifies that when McNally took charge it was
agreed with Heitkemper that he should run the mine in
the interest of the Virtue Mining Company, keep it open,
and give all benefit that might arise therefrom to the
company; that he (Grayson) was to reserve only the ex-
penses of mining it, and the company to have the benefit
of the net proceeds under the bond. This is denied by
Heitkemper in a general way. Grayson made no attempt
at concealment of the specimens of rich ore they had dis-
covered; on the contrary he freely exhibited them to Heit-
kemper and Stuart, and some of them were exhibited in
Portland to aid in disposing of the mine, and one, in value

about $900, was left with Heitkemper, which was later on returned to Grayson. This concludes a narrative of the most important events touching the present dispute, and from it we are to determine the relative rights of the parties.

It is contended: First, that Grayson and Boreman entered into a conspiracy to hinder and delay the Virtue Mining Company in raising the water from the mine, and to so burden and encumber the operation of it as to compel the company to abandon its privileges under the contract, after it had at large expense practically freed the mine of water, that Grayson might thereby reap the benefit of such outlay, and that the fact of the miners having taken forcible possession was but the means of a preconceived scheme by which Grayson should obtain possession through them; second, that, if the conspiracy is not established, nevertheless Boreman has been grossly culpable in his management of the mine, that he incited the men to riot, and that, having gained possession through this means, the acts of Boreman became Grayson's acts by adoption, and therefore his possession was wrongful; third, that in any event the company was not in default under the contract, and Grayson was not entitled to possession; and, fourth, that as a result of Grayson's entry, he has waived strict performance upon the part of the company in tendering payment of the purchase price before suit, because (1) he is himself at fault, (2) he has rescinded or repudiated the contract, and (3) an accounting was made necessary: Grayson contends: First, that the company had abandoned the mine when he took possession, and therefore his entry was rightful; second, that his possession was acquiesced in, and his management agreed to, by the company; and, third, that the company having failed to tender the purchase price, it has forfeited its privilege of purchasing under the contract.

First.   That the mine was not successfully operated under the supervision of Mr. Boreman is a fact beyond dispute, but the company was all the while cognizant of his methods of management.   George Walker, its representative and managing agent, was on the ground, and Boreman was subject to his superior authority, and it seems Boreman's supervision was concurred in in the main; we recall but a single instance of protest.   Boreman was perhaps unduly solicitous to serve the interest of Grayson, but from what motives it does not appear, possibly personal to himself.   This is made apparent from a letter written by Boreman April 29, addressed to Grayson, but never sent, wherein he gives several reasons why he thought the company could not succeed, and suggested that if Grayson would come to Baker City about May 10 or 12, he could see for himself where it would be to his interest to take hold of the mine.   He says:   "I earnestly ask you to come up as soon as possible; it is essential you should come, and to your best interests."   His acts about the time of the assignment and change of possession also indicate as much.   But it is not clear that Grayson acceded to his wishes, or in any manner connived with him in the embarrassment of the company, or the displacement of its possession.   He did appear at Baker City about the 9th of May, openly, however, and without any attempt to conceal his presence.   The company knew it, and Mr. Heitkemper, the secretary, was on the ground at the time, and the condition of affairs was discussed between them. Nothing was done or attempted on the part of Grayson indicating his intention to take charge of the mine until the assignment was made known to him, and we conclude that no conspiracy existed between him and Boreman to oust the company of possession.

As to the second contention, Boreman, as superintendent of the mine, being directly under the supervision

of the company and its representatives up to the time of the assignment, his acts must be deemed the acts of the company, and we do not think it proven that he incited the miners to riot. They probably took charge of the mine of their own volition, in order to make sure of their wages then unpaid, knowing that the company had assigned, which indicated its insolvency, so that there were no acts imputable to Boreman touching the change of possession for which any responsibility could attach to Grayson. The dispatch from Oakland would indicate that Grayson had employed a Baker City attorney to look after his interests. This he had a right to do, and to keep himself informed of any contemplated surrender of the company's rights, to know of the exact condition of affairs at the mine at all times, and especially of such an important matter as the assignment by the company of all its assets, which carried to the assignee the contract under which it was operating.

5. Under the third head, the company was evidently not in default, unless the assignment, the attendant circumstances, and the acts of the assignee operated as an abandonment. It is claimed that the company forfeited its right to possession by reason of not having operated and developed the mine in a proper and workmanlike manner, but this contention is not supported by the evidence. While, perhaps, it was not operated as Grayson thought it should be, yet other persons of experience would not be willing to condemn the work as being unskillfully done. We are not inclined to hold that the act of assignment was itself an abandonment, as it seems to have been resorted to as an expedient for the purpose of dissolving the attachments, and thereby removing an obstruction to the operation of the mine. The stockholders were prepared to meet the expenses under the management of the assignee, and it was the intention of all concerned to keep

it running. However, some acts of the company and the assignee subsequent to the assignment are strongly indicative of a purpose not to press their right to possession. The assignee, after appointing a meeting with Grayson on the morning following their conference on June 6, came away to Portland without keeping the appointment; and, although the miners remained in possession some six days later, neither he nor any person in behalf of the company returned to Baker City with a view to settling with the men or regaining possession of the mine, nor was there any correspondence had to that end. In fact, no representative of the company appeared at the mine to claim possession until Mr. Heitkemper and Judge Stuart made the alleged demand for it during the latter days of July. Shortly after Mr. Grayson assumed possession, he notified the company of what he had done, and his position in the premises. Thirteen days later, both the assignee and the company by letter disclaimed any abandonment upon their part, and demanded the mine and its proceeds and earnings. These circumstances, to say the least, do not indicate a great deal of solicitude on the part of the company as it respects possession for the time being, but they were perhaps sufficient to forestall an abandonment upon its part, or the part of the assignee. Under the contract, the company need not have operated the mine for a period of sixty days, but by its arrangements with Grayson he was to be notified if it determined at any time to discontinue its operation, so that he could keep the water from rising again, and Grayson claims that, although not notified, the conditions were such that he was justified in believing the company did intend to cease operations, and in entering for the purpose of preserving the property from damage. We are not prepared to say that Grayson was not in fault in entering when he did. The conditions under which he was entitled to enter had not trans-

pired, and we believe his possession was wrongfully obtained. It was urged, however, that Heitkemper, the secretary of the company, agreed with Grayson, in the latter part of July, that he (Grayson) should retain possession of and operate the mine, and account to the company for the net proceeds, after deducting expenses for operation, and that McNally should be employed as superintendent during the life of the contract. But it is useless to discuss this proposition, as Heitkemper was without authority to enter into such an agreement, and Grayson continued in possession in violation of his contractual relations with the company.

6. Again, it is strenuously urged that Grayson, by the act of entry and attendant circumstances, rescinded and utterly repudiated the contract, which operated as a denial of the company's right to purchase, and hence that it was absolutely excused from even a tender of performance before entering suit. On the 17th of July, Grayson wrote: "You have forfeited your rights under the bond * * * under which you were operating the mine, and abandoned it to your creditors. I have taken hold of the property as my right under the bond." The letter would seem to be broad enough to include a denial of all the company's rights under the contract, but it must be construed in the light of the attendant circumstances. Some time later Grayson wrote: "I have not at any time desired to prevent you from selling * * * and will not now stand in your way between this and September." The company, prior to the entry by Grayson, had been endeavoring to sell, and had, on May 29, offered to sell to Grayson its interest in the contract, on condition that he pay to it simply the amount of money which had been expended. Although this letter was intended to explain the former, it cannot change its effect. But, prior to writing the letter of the 17th, Grayson told Clarno that the company

could have the mine upon paying $45,000. Later he told Heitkemper the same thing in effect, and even made a more liberal offer; and not only this, Grayson and Mc-Nally, his superintendent, lent their assistance to the company and its officers in their endeavor to sell the mine, and we think it was fairly understood between the parties that Grayson did not gainsay the company's privilege or right to purchase under the contract. In the light of these incidents, Grayson cannot be held to have repudiated the contract. So that we have here the conditions of defendant occupying possession in contravention of the stipulations of the contract, and by reason of which he has rendered himself liable to account on some recognized equitable basis for the output of the mine during the holding prior to the institution of the suit. Grayson's wrongful possession, however, does not alone excuse performance on the part of the company. If it has suffered injury by such possession, it has its action at law for damages; but if it would have a specific performance, which seems to be the purpose of the present suit, it must itself perform all that is required of it under the contract. What it was required to do in order to entitle it to a conveyance of the mine was not prevented by Grayson's wrongful possession, nor was a tender of performance waived thereby, as it was not a denial of the company's privilege to purchase. We think it was well understood that Grayson's possession in no way interfered with the exercise of its option to purchase the mine. It was persistently urged in behalf of plaintiff that the company was entitled to the exclusive possession during the whole time to September 1, 1893, so as to enable it, within the spirit of the contract, to make up its mind as to whether or not it would exercise its privilege, and that Grayson, not having kept a cc dition which, in point of time, was to precede performar on the part of the company, thereby the company v

excused from performing, or at least from performing strictly. It is very true that the company was entitled to possession for the purpose indicated, but, notwithstanding the fact that Grayson obtained and kept possession, plaintiff has chosen to enforce performance; this it could not do without paying the purchase price, and if it must first pay, what is there in the transaction that will waive payment in the manner and at the time designated? Nothing that we can see. So that the fact of Grayson's wrongful possession does not alone excuse strict performance on the part of plaintiff, if he would enforce specific performance. It might have excused punctuality, but not performance.

7. Now, as to the accounting: It appears that Grayson extracted bullion to the value of $19,869.81 between the time of his taking possession and September 1, 1893. His expenses for the same length of time were $16,273.17. During this period no improvements were made, except what was necessary for the operation of the mine. This leaves a net product of $3,596.64. This amount the company was to have the benefit of, providing it exercised its privilege to purchase; otherwise it could have no interest in it. That is to say, if it concluded to take the mine and pay the difference between this sum and the $45,000, the right was accorded under the contract; but if it did not want the mine, then it could not claim any interest in this particular fund. At most, it could claim no greater benefit than the value of the gross product. There is no pretense that either the assignee or the company tendered to Grayson any part of the purchase price, or that an accounting was ever requested or demanded preliminary to an ascertainment of the amount required to be tendered to meet the balance due. An accounting out of court would have obviated the necessity of an accounting in court, and whatever might

have been the result of such a demand, it is certain there has been no refusal on Grayson's part to account. It was held in *Deichmann* v. *Deichmann*, 49 Mo. 110, that uncertainty as to the amount actually due will obviate the necessity of a tender. But, unless Grayson refused to account with the plaintiff, it is difficult to see how the simple fact that there was an unadjusted account between the parties can operate as a waiver of the tender. But, aside from this, if there was a balance remaining after deducting the proceeds, whether net or gross, from the $45,000, it was incumbent upon the plaintiff to tender such balance. Payment being the manner of declaring his privilege, no interest passed to him in the mine unless he so declared it; hence a suit for specific performance cannot lie. BIRD, V. C., in *Miller* v. *Cameron,** 45 N. J. Eq. 95 (1 L. R. A. 554, 15 Atl. 842), says: "There may be, doubtless are, many cases in which the complainant would be excused from showing an offer to perform; but I cannot but think, in a case where the complainant is not originally bound, that is, is not bound at all by the contract, and cannot himself be brought into court, he should by all means be required to show that he had most faithfully performed every stipulation on his part to be performed, so far as they appear on the record. If he intends to hold the other party to the contract which he has signed, he himself should not be guilty of a moment's trifling, without a most satisfactory excuse." See also Pomeroy's Specific Performance of Contracts, §§ 315, 324.

8. As touching the amount which he should have tendered, he was called upon to determine that at his peril, or he may have tendered on condition that Grayson account.

---

*Note.—With this case in 1 L. R. A. 554 is a collection of authorities discussing Enforcement of Unilateral Contracts; Performance by Complainant as a Condition Precedent to Specific Performance; and When Tender is Not Necessary.—REPORTER.

Of course, if Grayson had taken out a net product of $45,000 prior to September 1, 1893, no tender would have been necessary, and this is the theory that plaintiff seems to have proceeded upon. Or, perhaps, if he had taken out approximately that amount, so that it might reasonably be presumed that plaintiff purposed purchasing under his option, the result might have been the same. Equity has regard for substance rather than technical exaction. But he has not proven such a case. He does not even tender performance in the complaint or a willingness to pay any balance that may be found remaining of the $45,000 on an accounting. In *Duvall* v. *Myers*, 2 Md. Ch. 405, JOHNSON, Chancellor, says: "A party not bound by the agreement itself has no right to call upon the judicial authority to enforce performance against the other contracting party, by expressing his willingness in his bill to perform his part of the agreement. His right to the aid of this court does not depend upon his subsequent offer to perform the contract upon his part, when events may have rendered it advantageous to do so, but upon its originally obligatory character." See also *Ducie* v. *Ford*, 8 Mont. 240 (19 Pac. 411), and *Askew* v. *Carr*, 81 Ga. 686 (8 S. E. 74). The allegation is that he is "ready, willing, and waiting to perform." This is not a tender of performance. The offer in the complaint, if otherwise sufficient, should have been to do the things necessary to complete or mature the right which it was the plaintiff's privilege to acquire, so that there could have been no uncertainty touching his intention to purchase, providing the fund in the hands of Grayson proved insufficient to pay the purchase price. As the complaint stands, plaintiff does not disclose a desire to purchase upon any other condition except that of finding funds upon an accounting sufficient to pay the purchase price. He has failed to establish the condition, and the suit cannot be maintained.

9. One element of the prayer of plaintiff is that he be put in possession and maintained there, and that a future time be fixed in which plaintiff shall satisfy any balance found due on the accounting after possession given, and this proposition was urged both in the briefs and at the argument. We think it untenable for two reasons: First, the act required of the court comprehends an order continuous in its nature, requiring protracted supervision and direction, with the exercise of special knowledge, skill, or judgment in the oversight, to determine whether the mine is being operated under the conditions of the contract, and will not be specifically enforced: Pomeroy's Specific Performance of Contracts, § 312; *Marble Co.* v. *Ripley,* 77 U. S. 358; *Beck* v. *Allison,* 56 N. Y. 367 (15 Am. Rep. 430); *Masten* v. *Halley,* 61 Mo. 196; and, second, the fixing a new time for payment would be the making of a new contract. The court cannot make contracts for parties. Its duty is to determine their rights under the contracts they have made for themselves, and when this is done it can do no more.

This leaves undisposed of the question touching the right of the company under the contract to assign to Clarno without Grayson's assent, and the incidental questions of the power and authority of the assignee to take the possession of the assigned property prior to filing his undertaking as such an officer, or to operate the mine and declare the option by performance of the conditions made necessary by stipulation of the original parties, and his right to maintain the suit, their settlement not being necessary to a determination of the cause. What we have incidentally said touching such rights and authority has been upon the assumption that he was duly clothed therewith, but we are not to be understood as having decided any of these questions.

There was some controversy touching a twenty-stamp

mill which it is alleged that Grayson agreed to furnish This mill was constructed at the mine prior to the execution of the contract with Ralston, and subsequently, and prior to the time at which the Portland company became interested, was renovated and reconstructed into a ten-stamp concern, and this latter went into possession of the company, so there was no obligation on the part of Grayson to furnish a twenty-stamp mill as demanded. The renovated mill became the property of Grayson when the company failed to purchase the mine under the stipulated privilege. Let a decree be here entered affirming the decree of the court below.

AFFIRMED.