Argued Sept. 26, decided Oct. 17; rehearing denied Dec. 12, 1911.

## ELGIN v. SNYDER.

[118 Pac. 280.]

EXCHANGE OF PROPERTY—CONTRACT—RESCISSION—FRAUD—TIME.

1. Where plaintiff claimed to have been induced by fraud to exchange certain real estate for corporate stock, on October 19, 1907, after which he became the corporation's manager for a month, when he resigned because the corporation could not pay its bills, but he made no offer to rescind or return the stock until after suit had been brought therefor, March 6, 1909, he could not recover, under the rule that one who desires to rescind a contract must act promptly on discovery of the fraud.

CONTRACTS—FRAUD—RESCISSION.

2. One induced by fraud to make a contract, on discovering the fraud, has an election, either to affirm the contract and sue for damages, or disaffirm and be reinstated to his former position, but the adoption of one remedy excludes the other.

EXCHANGE OF PROPERTY—RESCISSION—DELAY—EXCUSE.

3. It is no excuse for plaintiff's delay of more than two years in electing to rescind an exchange of real estate for corporate stock, and to return the stock, that it afterwards became valueless, or that he did not discover evidence of the alleged fraudulent character of the transaction for a long time thereafter; he having retained the consideration he had received during the entire time.

SALES—FRAUD—OPINIONS.

4. Where parties are dealing on an equal footing, a seller's expression of opinion as to the value of property, no warranty being intended, is not evidence of fraud.

From Marion: WILLIAM GALLOWAY, Judge.

Statement by MR. JUSTICE BEAN.

This is a suit by Charles F. Elgin against S. H. Snyder and Laura Snyder, his wife, to rescind a contract, where-

by plaintiff conveyed to defendant S. H. Snyder 46 acres of land, valued at $2,000, in consideration of 35 shares of stock in the Salem Box & Lumber Company, a corporation, of the par value of $100 per share, on the ground of fraud. From a decree in favor of defendants, plaintiff appeals.

Plaintiff alleges, as the gist of his complaint, that said defendant, his agents, servants, and associates, who were the officers and stockholders of the corporation, for the purposes of cheating, wronging, and defrauding plaintiff, knowingly and falsely represented to the public, and to plaintiff, that said stock was of the value of 75 to 80 cents on the dollar, knowing that said shares were of no value whatever, and that the corporation was then insolvent, all of which is set out at length and with minute detail. For this purpose property of the value of about $3,500 was turned over to the company by Mason & Snyder, two of the incorporators, for $11,000 in stock. That on October 19, 1907, plaintiff, having no knowledge or means of knowledge of the falsity of such representations, believing them to be true and relying thereon, made the trade, caused the land to be conveyed to Snyder, and received the certificates of stock.

"That said plaintiff did not discover the nature and extent of such fraud, and the evidence by which the same could be proven, until long after March 16, 1908, when the petition had been filed in the United States Court for the purpose of throwing said corporation into bankruptcy."

Defendants S. H. Snyder and wife admit that the contract and exchange were made, but deny the alleged fraud and false representations to plaintiff concerning the stock, and aver that plaintiff knew the exact value of the stock at the time, and that it was of equal value to the premises conveyed. Plaintiff, by his reply, denies the new matter of the answer.

Upon the trial, plaintiff testified, in substance, that prior to the making of the deal he asked Mr. Hofer, one

of the stockholders, who was looking after the matter for Snyder, if the stock was worth 75 or 80 cents on the dollar. Hofer said, "Perhaps it would be." He made the exchange with defendant, and was chosen manager of the company, acting as scuh from October 25 to November 28, 1907. In a short time, finding out that the company did not amount to anything, and had no money to pay its bills, he told the directors that he would not serve in a firm that could not pay its bills, and resigned. He knew the company was in bad shape, but did not know that it was insolvent until March 16, 1908. While manager, he found statements of indebtedness contracted the summer previous, and entered them in the books. He and Mr. Hofer were appointed as a committee to examine the books kept while Mr. Snyder was manager, but, as it was such a tedious job, they simply accepted Snyder's work without examination. On cross-examination, plaintiff further stated that he did not look at the plant before making the contract. Some one told him there was about $1,900 of the company's indebtedness when he took the stock. He made practically no inquiry before concluding the bargain. He supposed Mason thought he was doing him a good turn by asking him to buy this stock. Plaintiff also said that he never offered the stock back to Snyder until the amended complaint was filed in December, 1909, though he did not try to sell it to Mr. McGilchrist. Finding the material on hand, machinery, etc., appraised too high was one of the causes that made him wish to sell out.

George F. Mason, witness for plaintiff, testified to the effect that he was formerly in partnership with defendant Snyder, in the box business, for five or six months, doing very fairly. Not having money enough to carry on the business, they incorporated the company and turned the property over to the corporation at $11,000, in stock. By purchasing the Voget property for $2,000, and Hurst lot for $150, by building warehouses and additions to the

buildings, and improving the plant generally, they placed themselves in debt about $9,000.

Wiley A. Moores, brother-in-law of plaintiff, testified in identification of the records of the directors' meetings. He stated that he was secretary of the company; that Snyder was manager from September 9, 1905, until plaintiff bought in; and, further, that he advised Elgin, before the deal was made to make a thorough investigation of the business.

Defendant Snyder, in giving his version of the matter, stated that at the time the company was organized they took an inventory of the Mason-Snyder property, and put what they thought a fair price on it; new machinery at cost; old at a depreciated value; lumber at cost laid down at the factory; finished products at estimated cost. In March, 1907, the plant was moved from South to East Salem. October 7, 1907, he, as manager, represented liabilities of the company to be $8,223.91, including part of the costs of improvements. He then thought that, if they could get a little money to tide them over until they could collect in, they would be able to carry the business through. He considered the stock at that time worth 60 cents on the dollar. Snyder stated, in substance, that the only conversation he had with plaintiff in reference to the purchase was a telephone message, in which Mr. Elgin asked him if he had some stock in the box factory to trade for land. He (Snyder) answered that he had and Elgin asked him to call at his real estate office. Authorizing Mr. Hofer to act for him, he first offered 30 shares, and Mr. Elgin offered to exchange for 35 shares. He made no false representation, and authorized none to be made. The farm was worth, or represented to be worth, in the neighborhood of $1,800. After trading with plaintiff, he lived here until the next August, but knew nothing about the business that winter.

A. F. Hofer, witness for defendant, stated that he and Wiley A. Moores checked over the inventory and invoices of the property turned over to the company, and considered $11,000 a fair valuation. Mr. Elgin, as manager, had access to the books, and could have obtained the books of Mr. Moores before he purchased. Acting for defendant, he traded "so much stock for so much land." The value of the stock was then somewhere between 60 and 70 cents. Plaintiff assumed management of the company, and never made his dissatisfaction known to him until plaintiff and his friends ran it into bankruptcy. "Then he commenced to squeal."

Robert McGilchrist testified in part that he bought three shares of stock in the company, January 1, 1907. In October, 1907, when he was one of the directors, stock was reputed to be worth about 75 cents on the dollar. Three weeks after Elgin became manager the latter offered him his stock for 75 cents and later for 50 cents. He came near selling his farm and buying the stock, as he considered the company solvent at that time. The business was a success during the time he was employed to run it. McGilchrist said, "These holidays hit us pretty hard," referring to the financial panic in this State which occurred soon after plaintiff entered into the business. It appears that for about six weeks, legal holidays, known as bank holidays, were declared, and banks were closed. During that time, boxes were shipped in from other factories and sold for less than they could be manufactured in Salem. The property of the company was appraised in the bankruptcy proceedings at $5,027.50 and sold for $3,000. The stockholders realized nothing on the stock.                                      AFFIRMED.

For appellant there was a brief over the names of *Mr. William M. Kaiser* and *Mr. Myron E. Pogue,* with an oral argument by *Mr. Pogue.*

For respondents there was a brief over the names of *Mr. John H. McNary* and *Mr. Charles L. McNary,* with an oral argument by *Mr. John H. McNary.*

MR. JUSTICE BEAN delivered the opinion of the court.

From the evidence it appears that the Salem Box & Lumber Company was an infant industry. Its parents, the incorporators, seemed to have had faith in its future development. Its success depended in a great measure upon faith and credit. The capital was limited, and instead of growing to huge proportions the industry pined away and died.

1. This contract, in controversy for the exchange of stock for land, was made about October 19, 1907. Plaintiff entered into active management of the business, assisted in increasing the debts of the company, and, as he states, found out in a short time that the concern did not amount to anything, and had no money to pay its bills with. For that reason, after about a month, he was unwilling to serve as manager. Notwithstanding this fact, he retained his stock, treated it as his own, speculated on the chance of the business improving, and the stock increasing in value, and did not offer to rescind the contract, or return the stock to defendant Snyder, until the complaint was filed in this suit, March 6, 1909; the tender of the stock being long after that date. It is a well-settled principle of law, and so held in this State, that one who desires to rescind a contract must act promptly upon the discovery of the accident, fraud, or mistake which affords grounds for the relief sought, and place the other party in *statu quo,* returning or offering to return that which has been received. *Vaughn* v. *Smith,* 34 Or. 54 (55 Pac. 99); *Sievers* v. *Brown,* 36 Or. 218 (56 Pac. 170); *Clarno* v. *Grayson,* 30 Or. 111 (46 Pac. 426).

2. It was held by this court, in *Scott* v. *Walton,* 32 Or. 460 (52 Pac. 180), that a party induced by fraud to make

a contract has, upon the discovery of the fraud, an election of remedies, either to affirm the contract and sue for damages, or disaffirm it and be reinstated in the position in which he was before it was consummated. The adoption of one of these remedies, which are wholly inconsistent, is the exclusion of the other. If he desires to rescind, he must act promptly, and return or offer to return what he has received under the contract. He cannot retain the fruits of the contract, awaiting further developments, to determine whether it will be more profitable for him to affirm or disaffirm it. Any delay on his part, especially in remaining in possession of the property received by him under the contract, and dealing with it as his own, will be evidence of his intention to abide by the contract.

3. The conduct of the plaintiff in this case, in regard to this contract, does not measure up to the standard of the rule laid down in either of the above cases for one who desires to rescind a contract on the ground of fraud. It was plaintiff's duty, when he became dissatisfied, found that the concern did not amount to anything, and would serve no longer as manager, if he desired to rescind the contract, to do so then, inform defendant S. H. Snyder, and return or offer to return the certificates of stock which he had received. He had no right to retain the same and await future developments, in order to ascertain whether, under favorable conditions, the venture of the company would be a success, or, under adverse circumstances, a failure. It was no excuse for plaintiff's failure to return the stock that it afterwards became valueless. *Crossen* v. *Murphy,* 31 Or. 119 (49 Pac. 858). Neither does the allegation in the complaint that he did not discover the evidence of the transaction for a long time thereafter, constitute an excuse for his delay of about two years. During this time he retained the consideration he had received, which was an evidence of his intention to

abide by the contract, and he is not entitled to maintain a suit in equity to rescind such contract. *Scott* v. *Walton,* 32 Or. 460 (52 Pac. 180).

As to the original transaction, it would seem from the evidence, which we have set out quite fully, that, while the figures placed upon the property of the company, represented in part by the certificates of stock transferred to plaintiff, were high, plaintiff was, to say the least, negligent in making no examination of the property, especially the real estate, and no investigation in regard to the value of the stock.

4. It is recognized by law to be characteristic of human nature for the owner to set a high value on his property, for the purpose of enhancing it in his purchaser's estimation. Hence, when the parties are dealing on an equal footing, it does not help the purchaser, who relies upon the vendor's statement as to value, when no warranty is intended, and when the language used does not affirm some specific fact, but is a mere expression of opinion. *Scott* v. *Walton,* 32 Or. 460 (52 Pac. 180), Pomeroy's Equity Jurisprudence, § 878.

The trial court found for defendant in regard to the validity of the contract, and, under all the evidence and circumstances of the case, we think the decree of the circuit court was right and should be affirmed, and it is so ordered.                  AFFIRMED.