Argued January 19, reversed February 15, 1916.

## T. B. POTTER REALTY CO. *v.* BREITLING.*
### (155 Pac. 179.)

**Vendor and Purchaser—Remedies of Vendor—Recovery of Price.**

1. A stipulation in a contract for the sale of land that, in case of default in the payment of any of the installments, all sums paid should be lost to the purchaser, and the contract should be null and void to both parties, prescribes an exclusive remedy for the purchaser's default, and prevents the vendor from recovering unpaid installments.

---

*On the waiver of purchaser's right to rescind, see note in 30 L. R. A. (N. S.) 872.

The measure of damages for fraudulent representations in the sale or exchange of real estate is discussed in notes in 8 L. R. A. (N. S.) 804; 16 L. R. A. (N. S.) 818.                 REPORTER.

Vendor and Purchaser—Remedies of Purchaser—Rescission—Laches.

2.   Where a purchaser of land which fluctuates constantly in value understakes to rescind the contract by reason of fraud, he must act speedily.

Vendor and Purchaser—Right of Action.

3.'  A purchaser of land, who has been induced to enter into the contract by a deceitful practice or willful device of another with intent to injure him may, upon discovery of the fraud, treat the agreement as subsisting, and maintain an action for damages which he has sustained.

> [As to liability of vendor for false representations innocently made, see note in **Ann. Cas.** 1913C, 63.]

Vendor and Purchaser—Remedies of Purchaser—Rescission—Laches.

4.   Where a purchaser of land, being informed that it was not as represented, stopped payments of installments on the price, but waited six months before visiting the land, which was within a day's journey of his residence, and from a year to 17 months before taking proceedings against the vendor, his right to recover payments, made upon rescission of the contract, is barred by his delay.

Vendor and Purchaser—Remedies of Purchaser—Nature of Remedy.

5.   In an action for unpaid installments of the price of land, affirmative defenses, seeking to recover payments made, alleging offer of defendant to return the written agreements, and followed by assignments of the contracts to the vendor after verdict in favor of the purchaser, were predicated on the ground of rescission of the contract.

Evidence—Competency—Value.

6.   In an action between the vendor and purchaser of land, testimony of the purchaser that the land was worth nothing to him was incompetent; the value being determined from the sum to be realized from a voluntary sale thereof.

From Multnomah: John P. Kavanaugh, Judge.

Department 2.    Statement by Mr. Chief Justice Moore.

On December 2, 1913, the T. B. Potter Realty Company, a corporation, commenced an action against George S. Breitling to recover the then matured installments of the purchase price of real property.    The complaint substantially charges that the plaintiff is a corporation, and on June 17, 1909, it entered into a written agreement with the defendant, whereby it undertook to sell to him lot 10 in block 89 in Bayocean

Park, Tillamook County, Oregon, for $750, with interest from that date at 6 per cent per annum, of which sum he then paid $10, and engaged to make a like payment each month thereafter until the entire consideration was liquidated, the interest to be payable at the maturity of the last installment; that between June 17, 1909, and December 5, 1912, the defendant, pursuant to the terms of the contract, paid the plaintiff on account thereof $390, setting forth the respective dates and the sums of money so received; that no other payment has been made than as stated, and there then remained due and owing from the defendant to the plaintiff under the agreement the sum of $150.

For a second cause of action the material averments of the first cause are repeated, the complaint, alleging a contract was consummated August 5, 1909, whereby the plaintiff engaged to sell to the defendant lot 19 in block 80 in Bayocean Park for $750, upon the same terms and considerations as stated in the preceding cause of action; and that between August 5, 1909, and July 8, 1912, he had paid only $370, setting forth the items and dates, thereby leaving due and owing the plaintiff $150.

For a third cause of action, the material allegations of the first cause are reiterated, the complaint, averring another contract, was concluded February 9, 1910, by the terms of which the plaintiff stipulated to sell to the defendant lot 20, in block 70, in Bayocean Park for $700, upon the same terms and conditions as first stated; and that between February 9, 1910, and July 8, 1912, he had paid only $310, giving the dates of such payments and the amounts thereof, thus leaving due and owing the plaintiff $150.

For a fourth cause of action, the complaint recapitulates the essential averments of the first cause, and

alleges that a contract was entered into August 5, 1909, whereby the plaintiff engaged to sell to the defendant lot 18 in block 80 in Bayocean Park for $750, upon the same terms and conditions as alleged in the first cause of action; and that between August 5, 1909, and July 8, 1912, he had paid only $370, specifying the times and particulars thereof, whereby there remained due and owing the plaintiff $150. Judgment was demanded for these several sums amounting to $600.

The answer to the first cause of action admits the averments of the complaint as to the plaintiff being a corporation, the making of the contract for the sale of lot 10 in block 89 in Bayocean Park for the sum of $750, the payment of $390 on account thereof, but denies that $150, or any other sum, is due or owing from the defendant to the plaintiff on account of such agreement, or at all. For a further defense, and by way of counterclaim to the first cause of action, the answer avers, in effect, that at all the times stated therein the plaintiff was the owner of lot 10, in block 89, of Bayocean Park, as appears by the plat thereof, on file and of record in the office of the county clerk of Tillamook County, Oregon; that prior to the making of the written agreement by the parties for the sale of that lot, the plaintiff, by its officers and agents, represented to the defendant:

(1) That all the land delineated on such plat, and particularly the lot last described, was sightly.

(2) That the value of that lot was about $1,500, but in order to start a sale of the tract, the plaintiff would convey the lot to the defendant for $750.

(3) That if the defendant purchased the lot, the plaintiff would forthwith improve it by laying water-pipes either in front, in the rear, or through such lot.

(4) That the corporation would grade and pave the street in front thereof.

(5) That it would clear the brush, trees and rubbish from the lot and level it.

(6) That on either side thereof, the plaintiff would lay paved sidewalk.

(7) That in the vicinity of such lot the corporation would lay out and improve about six acres of land, erect thereon a first-class hotel, and various other popular attractions, in order to induce the public to purchase lots in Bayocean Park and locate thereon, and generally to improve all the streets in the tract by grading and paving such highways, laying sidewalks, clearing timber and brush from the tract and improving all thereof.

(8) That without any additional cost to the defendant, the plaintiff would install at Bayocean Park, on the west side of Tillamook Bay, at least three docks, and operate therefrom a ferryboat to some suitable railroad station on the east side of that bay.

(9) That in preference to all other real property in Bayocean, the corporation would improve lot 10, in block 89 thereof, and the streets and avenues joining thereon in the manner here alleged.

(10) That in addition to such representations the plaintiff and its agents delivered to the defendant pictures, showing improvements already completed at Bayocean Park, and also gave him books and pamphlets representing other improvements that were forthwith to be made on the tract, requesting him to preserve such literature and examine such pictures in order to ascertain the kind of betterments to be made, assuring him that in consequence thereof, if he purchased the lot, the value thereof would enhance within a year or two to double or treble its then value.

That at the time the contract to purchase such lot was concluded, the defendant had not seen the land so platted, and was without any knowledge of the character thereof, and believed the representations so made and the statements contained in the books and pamphlets and the portrayal delineated in the pictures so given to him, and, relying thereon, he was induced to purchase the lot for the price and upon the terms stated in the complaint. That in the latter part of the year 1912, the defendant was informed that the representations so made were false, whereupon he ceased making further payments on account of the purchase of the lot. That in July, 1913, he personally inspected the land so platted, and for the first time discovered such representations were false in that: (1) The plaintiff had not laid water-pipes either in front, in the rear or across such lot; (2) the corporation had not cleared the brush, trees and rubbish from the lot nor leveled it; (3) the plaintiff had failed to grade or improve the street abutting such lot; (4) it had neglected to lay sidewalks on either side thereof; (5) it had not carried into effect or completed any of the undertakings which it represented would be made to improve the tract so platted, in that it did not grade and pave the streets and avenues, clear and level the tract and lots thereof, lay sewer and water pipes, put down sidewalks, build docks, operate a ferryboat, and generally improve such lot and tract; (6) the worth of the lot at the time the defendant agreed to purchase it was not $750, nor has its value enhanced since that time. That such representations were false, and so known to be by the plaintiff when they were uttered, and were made by it and its agents with the intent and for the purpose of inducing the defendant to buy the lot. That, relying upon such representations to be true, he was induced

to purchase the premises ''and was thereby defrauded out of the amount of money paid to the plaintiff on said lot, to wit, in the sum of $390.''

That prior to the commencement of this action, the defendant notified the plaintiff of such fraud and deceit, and thereupon demanded of it the repayment of the money which it had so received from him on the purchase of such lot. That the corporation then agreed to compensate him for the losses which he sustained by reason of the transaction. That notwithstanding such promise the plaintiff failed and refused to return the sum of $390, the money so paid, or to compensate him for the losses which he had suffered. The separate defenses as to the other causes of action alleged in the complaint are substantially the same as the averments of the answer hereinbefore set forth, except as to the descriptions of the several lots agreed to be purchased, the times of making contracts therefor, and the payments of sums of money thereon, amounting to $1,440, for which judgment was demanded. The reply put in issue all the allegations of new matter in the answer, and, the cause having been tried, resulted in a verdict and judgment for the defendant for the sum so demanded, and the plaintiff appeals.                     Reversed and Dismissed.

For appellant there was a brief over the name of *Messrs. Veazie, McCourt & Veazie,* with an oral argument by *Mr. J. C. Veazie.*

For respondent there was a brief over the name of *Messrs. Schmitt & Schmitt,* with an oral argument by *Mr. G. G. Schmitt.*

Opinion by Mr. Chief Justice Moore.

There was received in evidence at the trial in support of the first cause of action set forth in the com-

plaint a contract entered into June 17, 1909, between the Potter-Chapin Realty Company, a corporation, and Emma Whitney for the sale of lot 10 in block 89 of Bayocean Park for $750. She on December 30, 1910, for the expressed consideration of $1 assigned all her right, title and interest in the contract to the defendant. The second cause was manifested by a contract signed August 5, 1909, by the company last named and M. D. Jameson, for the sale of lot 19 in block 80 for $750. He on February 23, 1911, assigned in the same manner all his interest in the agreement to the defendant. The third cause was upheld by a contract concluded February 9, 1910, between the Potter-Chapin Realty Company and Harry M. Howard for the sale of lot 20 in block 70 for $700. He, on December 29, 1910, assigned in like manner all his interest in the agreement to the defendant. The fourth cause was evidenced by a contract consummated August 5, 1909, between the plaintiff and the defendant herein for the sale of lot 18 in block 80 for $750. Each of these contracts contains clauses which read:

"The party of the first part agrees to have water-pipes laid either in front, or rear, or through each lot sold in Bayocean Park (said water-pipe to belong to the party of the first part); to grade and pave all streets in Bayocean Park, and to lay paved sidewalks on each side of same; to lay out and improve grounds to contain not less than six acres, and to erect on said grounds a first-class hotel and such other attractions as may be deemed most suitable and desirable by it; to install at least three docks, or boat landings, on the bay side of Bayocean Park, and to operate a ferryboat between Bay City, or some other suitable railroad station, on the eastern side of Tillamook Bay and Bayocean Park.

"Said first party hereby agrees to work continuously on said improvements, and to expend not less than one hundred thousand dollars ($100,000) each year from

January 1, 1909, until same is fully completed. All improvements herein named to be made without expense to party of second part. * * The said second party, in consideration of the premises, hereby agrees that * * he * * will make punctual payments of the above sums as each of the same shall become due respectively, and that in respect to each of such payments time is of the essence of this contract. It is further agreed that in case the said party of the second part shall fail to make any such payments promptly at the time provided in this contract for such payment, or shall fail in the performance of any other agreement herein contained by him to be performed, or violate any other of the agreements herein contained, then and in any such case all payments which shall have been made by the party of the second part hereunder shall. be absolutely and forever forfeited to the said party of the first part, and this contract shall be null and void as to both parties hereto without notice, and the said party of the first part shall have the right, without notice, thirty days after the failure of the party of the second part to comply with the stipulations of this contract, or any one of them, to enter upon the land aforesaid and take immediate possession thereof, together with the improvements and appurtenances thereto belonging. And the said party of the second part covenants and agrees that * * he * * will surrender unto said party of the first part the said land and appurtenances without delay or hindrance.''

1. In construing these provisions, contained in a like agreement, it was held in *T. B. Potter Realty Co.* v. *Derby,* 75 Or. 563 (147 Pac. 548), that the writing, having stipulated that in case of default in the payment of any of the installments as they matured, all sums of money paid under the terms of the contract should be lost to the purchaser and ''this contract shall be null and void as to both parties,'' prescribed an exclusive remedy for the purchaser's failure, neglect or refusal to keep his engagement, and prevented the vendor from

recovering unpaid installments of the purchase price. The conclusion reached in that case, though the decision was rendered after this cause was tried in the lower court, necessarily determines that the plaintiff herein is not entitled to recover any part of the unpaid installments of the purchase price.

The question, therefore, to be considered is whether or not the case made by the defendant conclusively shows that by reason of the alleged fraudulent representations of the plaintiff he is entitled to recover the sums of money paid on account of his purchase of the several lots in Bayocean Park. It is argued by plaintiff's counsel that the several answers, by way of counterclaims, do not state facts sufficient to constitute defenses, in that they contain neither an averment that the defendant had rescinded or sought to annul the contract, nor an allegation that he had sustained any damages by reason of the asserted false representations. An objection to that effect was interposed to questions propounded to the defendant who, as a witness in his own behalf, was interrogated in respect to the alleged false representations, but, the objection having been overruled, an exception was allowed.

Based on the same grounds, the plaintiff's counsel, when both parties had introduced their evidence and rested, moved for a directed verdict in favor of their client, but the motion having been denied an exception was saved. Thereupon the defendant's counsel stated to the court that the written agreements had been received in evidence, and if a verdict were returned for the defendant he would, before the judgment was entered, make proper assignments of the contracts to the plaintiff, thereby complying with the tenders alleged in the answer.

The evidence discloses that a very narrow strip of land, forming a peninsula, containing about 600 acres, situate between the Pacific Ocean and Tillamook Bay and extending southerly from that inlet of the sea, was purchased by the plaintiff, which caused the premises to be surveyed and platted as a summer resort and called Bayocean Park. The surface of this tract is quite uneven and, though composed chiefly of sand dunes, the soil contains sufficient alluvion to grow successfully trees, brush and shrubs. By a system of extensive advertising in newspapers, and by a profuse distribution of books and pamphlets, setting forth the assumed marvelous attractions and superior advantages of Bayocean Park, and by the employment of a printed map on which the streets were indicated as open for travel, and many lots were represented as containing buildings, as the resort would appear when completed as contemplated, many parcels of the land were sold at what now appears to have been exorbitant prices, only a very small part of which was paid down, the remainder of the consideration being payable in monthly installments, varying from $6 to $10 according to the purchase price. From the sums of money thus obtained, the plaintiff caused to be erected a hotel, a dancing-hall, and other improvements, to be graded and paved several streets, and to be partially buried in the sand a single line of small iron pipe conducting fresh water to the grounds. If the persons who agreed to purchase lots had been able, ready and willing to keep their engagements by promptly paying the monthly installments as they severally matured, the plaintiff might possibly have carried out the magnificent scheme of improvement and adornment of which its agents were the authors and promoters. When sums of money for the sale of real property were freely

flowing in constant streams to the plaintiff's coffers, the prices of lots in Bayocean Park, which at all times were only speculative, fluctuated as hope was inspired by the circulation of new rumors of speedy improvement, or disappointment was induced by failure to realize the expected advantages, thereby either stimulating further investments or retarding payments of monthly installments. Financial depression on the Pacific Coast, as elsewhere in the United States, punctured the bubble of speculation, which obtained in respect to lots in Bayocean Park, resulting in disaster to the plaintiff and misfortune to the purchasers.

2. These varying and imaginary selling prices of lots in such platted land demanded of a purchaser thereof, who undertook to rescind a sale of any part of the real property by reason of alleged false representations, speedy action in order immediately to place the vendor *in statu quo,* by returning or offering to give back everything of value that had been received.

"Where a party," says Mr. Justice Swayne in *Grymes* v. *Sanders,* 93 U. S. 55, 62 (23 L. Ed. 798), "desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value."

3. A party to a contract who has been induced to enter into it by the deceitful practice or willful device resorted to by another with intent to injure him may, upon the discovery of the fraud, treat the agreement as

subsisting and maintain an action to recover the damages which he has sustained.   He may, however, if he act promptly upon such ascertainment, restore or offer to return, whatever he has received under the contract, and sue for the consideration which he has given or paid.   He cannot retain the advantages of the agreement in order to determine whether or not a disaffirmance is the more profitable course to pursue.   Rescission demands prompt action on the part of the defrauded party, and any unreasonable delay in asserting a disaffirmance of the contract will be considered as an election to treat it as continuing, and his right of action will be limited to a recovery of the damages which he has suffered: *Knott* v. *Stephens,* 5 Or. 235; *Wells* v. *Neff,* 14 Or. 66 (12 Pac. 84, 88); *Frink* v. *Thomas,* 20 Or. 265 (25 Pac. 717, 12 L. R. A. 239); *Clarno* v. *Grayson,* 30 Or. 111 (46 Pac. 426); *Crossen* v. *Murphy,* 31 Or. 114 (49 Pac. 858); *Scott* v. *Walton,* 32 Or. 460 (52 Pac. 180); *Vaughn* v. *Smith,* 34 Or. 54 (55 Pac. 99); *Sievers* v. *Brown,* 36 Or. 218 (56 Pac. 170); *Dundee Mortgage Co.* v. *Goodman,* 36 Or. 453 (60 Pac. 3); *State* v. *Blize,* 37 Or. 404 (61 Pac. 735); *Waymire* v. *Shipley,* 52 Or. 464 (97 Pac. 807); *Elgin* v. *Snyder,* 60 Or. 297 (118 Pac. 280); *Van de Wiele* v. *Garbade,* 60 Or. 585 (120 Pac. 752); *Hewitt* v. *Andrews,* 69 Or. 581 (140 Pac. 437); *Seeck* v. *Jakel,* 71 Or. 35 (141 Pac. 211, L. R. A. 1915A, 679); *Whitney* v. *Bissell,* 75 Or. 28 (146 Pac. 141, L. R. A. 1915D, 257); *Spence* v. *Hull,* 75 Or. 267 (146 Pac. 95).

4. The defendant had never been in possession of any of the lots which he agreed to purchase, so that the value thereof is unimportant.   What he received was the written agreement.   These contracts when returned were not canceled by the plaintiff and another

agreement executed, but the original writing was assigned by a purchaser to another vendee, who had evidently been secured by the plaintiff. The last payment on one of the causes of action was made December 5, 1912, while the last payment on the other causes was made July 8, 1912. It will be remembered this action was commenced December 2, 1913. It will thus be seen that a period of 11 months and 27 days had elapsed in one cause, and 1 year, 4 months and 24 days in the others before the plaintiff undertook to recover the matured installments.

The defendant testified, as averred in the answer, that, having heard rumors to the effect that the alleged statements so made by the plaintiff were false, he ceased making further payments on the contracts, but that he did not visit and inspect the lots until more than six months thereafter when he found that such representations were untrue. The defendant resided at Portland, Oregon, and in a day he could have made the journey from that city to Bayocean Park. He is chargeable with laches in not sooner ascertaining and properly asserting his rights, and in consequence of such neglect he is not, by reason of an attempted rescission, entitled to recover any part of the sums of money which he paid on account of the contract.

5. That the affirmative defenses interposed to the several causes of action were predicated on the ground of rescission is evidenced by the alleged offer of the defendant to return the written agreements, after he had inspected the lots, if such proposal can be considered a tender, and by his assignments of the contracts, which were evidently made after the verdict in his favor was returned. These assignments were acknowledged September 12, 1914, or 3 days after the trial of the cause was commenced.

6. The defendant, referring to the lots which he agreed to purchase testified they were worth nothing to him.  Based on this sworn statement, his counsel maintain that the sum of $1,440, which was paid on the contracts by the client, is the measure of the recovery to which he was entitled as damages caused by the fraudulent representations.  What property may be worth to a particular individual affords no evidence of its value, which is determined from the sum to be realized from a voluntary sale thereof.  The defendant's testimony was incompetent, and as no other evidence on this subject was offered, it must be assumed the lots had some value, so that the judgment rendered is not the true measure of recovery, even if the defenses interposed be construed as seeking a recoupment of damages.  The latter theory presupposes a full performance of the terms of the contract by the vendor, and if such hypothesis were carried into effect, the defendant would be entitled to conveyances of the lots, which he had agreed to purchase, without paying any consideration therefor.  It will thus be seen that the affirmative defenses are nothing more than attempts to rescind without tendering the contracts or offering to place the plaintiff *in statu quo,* which proffer is essential in a law action.

Without adverting to the allegations of new matter in the answer, which it is maintained by plaintiff's counsel are insufficient to constitute defenses to the action, it is concluded that an error was committed in not dismissing the action as to both parties.  From these considerations it follows that the judgment is reversed and the action dismissed as indicated.

REVERSED AND DISMISSED.

MR. JUSTICE BEAN, MR. JUSTICE BURNETT and MR. JUSTICE HARRIS concur.