Argued November 3, 1961, reversed January 31, 1962

## FEDERICI ET UX *v.* LEHMAN ET AL

368 P. 2d 611

*Stuart W. Hill,* Portland, argued the cause for appellants. On the briefs were Gilley, Busey, Hill & Nash, Portland.

*J. Robert Jordan,* Portland, argued the cause for respondents. With him on brief was John F. Reynolds, Portland.

Before McAllister, Chief Justice, and Warner, Perry, Sloan and Brand, Justices.

PERRY, J.

The plaintiffs brought this action alleging that they had rescinded a contract entered into between themselves and the defendant John Bates for the purchase of real estate situated in the city of Portland and seek to recover back money advanced in the purchase of the property.

The complaint alleges, as grounds for their right to rescind, fraud committed by defendants and mutual rescission by the parties. Defendants deny both contentions of the plaintiffs.

The jury returned a verdict for the plaintiffs and the defendants appeal.

The complaint alleges that the plaintiffs entered into a written contract with the defendants "whereby defendants agreed to sell and plaintiffs agreed to buy" certain described real estate for a definite sum of money; that plaintiffs paid $5,106.90 thereon; that their purpose in purchasing said property was to construct a medical clinic thereon; that defendants made false representations upon which the plaintiffs relied;

> "IX. That, as soon as plaintiffs discovered the true facts and learned of the fraud and deceit which had been practiced upon them in the manner aforesaid and on or about the 12th day of October, 1959, plaintiffs notified defendants of the fact that they had been so defrauded and were therefore rescinding the said contract and did then and there demand that defendants return to plaintiffs the amount paid under the said contract. That there is nothing further for plaintiffs to do to rescind the said contract."

There is no evidence that would support plaintiffs' contention of mutual rescission. The defendants' answers deny the allegations of plaintiffs' complaint. While plaintiffs state "there is nothing further for plaintiffs to do to rescind the said contract", this is merely a conclusion of the pleader and not a recital of fact.

■ It is well established that one induced to enter into a contract by fraud may upon discovery of the fraud elect his remedy. He may either rescind the con-

tract and be returned to his former position or he may affirm the contract and sue for the damages suffered by reason of the fraud. *Kruse v. Bush,* 85 Or 394, 167 P 308; *Nisson v. Tillman et ux,* 213 Or 133, 323 P2d 329; *Bridgmon v. Welker,* 218 Or 130, 344 P2d 233.

■ If a defrauded party elects to rescind he may bring an action at law if full relief may there be granted or he may bring a suit in equity.

■ It is an elementary principle that if the recovery is sought at law, one who seeks to recover that which he has paid under the executory contract must tender back what he has received under the contract or show some legal excuse for his failure. Restatement of the Law, Contracts, § 480.

"* * * Ordinarily, before an action at law based upon rescission of a voidable contract can be maintained, such restitution of what the plaintiff has received by virtue of the contract as is necessary to put the other party back in the position he was in prior to the making of the contract must be made or attempted." Contracts, 12 Am Jur 1032, § 451.

■■ In an equitable action for rescission, an offer in the complaint is sufficient for equity has the power to render full and appropriate relief to all parties regardless of the specific prayers. *Katz v. Obenchain,* 48 Or 352, 85 P 617; *Ruth v. Hickman,* 214 Or 490, 330 P2d 722.

This is not true in an action at law and therefore one who claims a right to rescind must place the party in status quo or attempt to do so before bringing his action at law. *T. B. Potter Realty Co. v. Breitling,* 79 Or 293, 155 P 179.

"* * * Many of the courts have, in dealing with this question, completely lost sight of the plain

distinction between the equitable remedy of rescission or cancellation (where, as in all equity decrees, complete relief is awarded to the defendant as well as to the plaintiff), and the legal remedies, based upon rescission of a contract by the act of a party thereto, where, in the act of rescission itself, the plaintiff must restore or attempt to restore the consideration, since, in legal theory, the *ex parte* act of rescission reinvests him with the legal title to the thing for the possession of which he subsequently sues, and must, therefore, be conditioned upon a surrender of the thing already received by him in pursuance of the transaction which he thus avoids. Restoration or tender before suit is thus a necessary element in legal rescission, but is wholly superfluous as a prerequisite to the commencement of a suit in equity for rescission or cancellation; and insistence upon it as such prerequisite often works a complete denial of justice. * * *" 5 Pomeroy on Equity Jurisprudence, 2d ed, p 4765, § 2110.

■ This rule of law of prior restoration or tender applies to contracts governing the sale of real property as well as contracts governing other transactions. *T. B. Potter Realty Co. v. Breitling,* supra; *Roberts v. James,* 83 NJL 492, 85 A 244; *Lackovic v. Campbell,* 225 Mich 1, 195 NW 798; *Barker v. Fordville Land Co.,* 264 Mich 95, 249 NW 491; *Walcrath Realty Co. v. Van Dyke,* 263 Mich 316, 248 NW 634; *Todd v. Bettingen,* 109 Minn 493, 124 NW 443. This rule of prior restoration applies to contracts rescinded by mutual agreement as well as contracts rescinded by one party as a matter of right. *Mascall v. Erikson,* 131 Or 509, 283 P 2.

There is some divergency of opinion among courts as to the necessity of a prior conveyance and tender by a vendee back to a vendor before commencement of

an action of rescission where the contract of sale is in installments and the deed and possession are to be delivered upon full payment of the purchase price. See cases cited supra. And we note this statement, which is dictum, in *Kruse v. Bush,* 85 Or 394, 167 P 308 (supra) which deals with a vendee's right to rescind for fraud a land purchase contract:

> "The contracts with which we are concerned were executory; the quitclaims were required only because plaintiff and her assignor had recorded their contracts."

In *Kruse v. Bush,* supra, as in *Roberts v. James,* supra, there was a contract of purchase of real property under which the vendee was to receive a deed and possession only upon completion of the purchase price. Before completing payment of the purchase price and receiving the deed or possession, the plaintiff, as vendee, brought his action to rescind. Under these circumstances the court seemed to be of the opinion that a complete renunciation of the equitable title in the vendee in his complaint was sufficient to re-invest the vendor with the fee simple title, so that no further action on the part of the vendor to establish his record title would be necessary.

The matter now before us is different. The contract provides: "Possession of said premises is to be delivered to the purchaser on or before date of closing 1959."

At the time the contract was entered into there was a building upon the premises occupied under written lease by Guy and Mary Chimenti. The building was used by the lessees as a restaurant and on June 17, 1959, an agreement was entered into between the plaintiffs and the Chimentis for a cancellation of the lease

and the removal of the lessee's property on or before July 10, 1959.

The agreement also provides:

"\* \* \* In view of the fact that the demised premises are to be demolished by second party, first party shall within said period of time have the right to remove any part or all of the structure occupied by them under said lease, provided, however, that any personal property or portion of said structure not removed by the date last mentioned above shall be considered abandoned and second party shall have the right to destroy or otherwise dispose of the same and shall have no obligation to account to first parties."

It therefore appears from the record that the plaintiffs went into possession and authorized the destruction of the building. There is also some evidence in the record that the Chimentis damaged and removed some portions of the real property.

In 5 Corbin on Contracts, § 1114, we read:

"With respect to the return of the consideration received and the restoration of the status quo as a condition of the plaintiff's right to restitution of the consideration paid or otherwise given by him, the rules of law are substantially the same, whether the plaintiff is asking restitution on the ground of fraudulent representation by the defendant or on the ground of failure of consideration due to a total breach of contract by the defendant."

But whether an offer by the plaintiffs to place the defendants in status quo is a condition precedent to the commencement of an action for rescission need not be here determined, for it is certain that somewhere in the proceedings there must be some affirmative action on the part of the plaintiffs to place the defendants in status quo, and there is none.

At the conclusion of the evidence the defendants each moved for a directed verdict upon the ground that there was no evidence of an offer to place the defendants in status quo. The motion should have been granted.

The defendants also moved for a directed verdict on the grounds that there was a failure to prove fraud. This motion was also denied and is assigned as error.

The allegation of fraud relied upon by the plaintiffs to justify their right to rescind the contract consisted of a statement that "defendants had secured and would furnish to plaintiffs eight tenants to occupy the said structure" and that they, the defendants, "would remove from the property at their own expense the tenant of defendant in possession of said property."

■ It is well established that false representations to constitute fraud that will relieve a party to a contract must be such representations as would deceive a person of ordinary intelligence. *Wheelwright v. Vanderbilt,* 69 Or 326, 138 P 857; *Holmberg v. Prudential S. & L. Ass'n,* 130 Or 1, 278 P 943; *Union Central Life Ins. Co. v. Kerron,* 128 Or 70, 264 P 453.

This simply means that the false representations are such that under the attendant circumstances plaintiff, a person of ordinary intelligence, has a right to rely upon them. *Andrews v. United Finance Co.,* 204 Or 429, 283 P2d 652.

In substance, the facts testified to by the plaintiff Paul A. Federici, a real estate dealer and builder, are that defendants interested him in the purchase of the property upon which he proposed to build a building with office space for doctors and dentists; that at the time the negotiations commenced the defendants had already procured plans for the structure to be built.

These plans were not acceptable to him and he so advised the defendants. He entered into the written agreement and subsequent to its execution he had preliminary drawings made of the proposed building.

In reference to the representations respecting the tenants in the building to be constructed which he states induced his entry into the contract and his election to rescind, he testified as follows:

"A  That I would be able to get the lessee, or tenant of the restaurant, out within thirty days. *He further stated that he would have eight dentists for me, that there wouldn't be any problem in that respect,* inasmuch as I stated to him my mortgagee, my insurance company, required 50 per cent signed up tenants before they would make a *  *  *  [loan] for the medical-dental building. (Italics ours)

"*  *  *  *  *

"A  We discussed it again, and Mr. Lehman and Mr. Brickley promised that they would secure the leases for me.

"*  *  *  *  *

"Q  Between February 2nd and April 29th, did you visit him more than once at his drug store?
"A  I did so, at his request.
"Q  Will you describe the nature of this discussion now with Mr. Bates at his drug store?
"A  Mr. Bates would call me to come to his pharmacy, to give me names of so-called prospects, names of doctors and dentists for the medical-dental building. He would give them to me on various scraps of paper, and be very enthusiastic about the prospects, and urge me to call immediately. I did so, and on occasions when I did not do so, my secretary made these calls.

"*  *  *  *  *

"Q  Now at any time during this period of time, this is between February 2nd to April 29th, did

Mr. Lehman, or Mr. Bates, or Mr. Brickley, submit any proposed leases to you?

"A During this period they gave me the names of three professional people, two dentists and one doctor.

"Q Who submitted those to you?

"A Mr. Donald Lehman.

"Q Was that all that agreed to lease?

"A That was all that agreed to lease space in this proposed new building.

"* * * * *

"Q Now then, you testified, I believe, you didn't execute and deliver that note and mortgage to Mr. Lehman, or Mr. Bates. Is that correct, Mr. Federici?

"A Yes.

"Q Why not, please?

"A Mr. Lehman and Mr. Brickley, who had promised me the eight tenants, were not forthcoming. I felt they had not kept their end of the bargain, and I felt that we were at an impasse.

"Q Did you so advise them?

"A I told them unless I have the names of these eight tenants that I could submit to my insurance company for a construction loan, I couldn't and wouldn't go ahead under the plans which were received, and I wouldn't sign the note and mortgage to this.

"* * * * *

"Q I thought a minute ago you said you ordered a set of plans from your own designer or architect?

"A That is correct,—in compliance with a request of Mr. Lehman to get eight tenants, that he said he had for me.

"Q Is this the plan that was prepared at your request, of your designer?

"A That is right, sir.

"* * * * *

"Q I will show you Exhibit 10 and ask you what that is.

(Presenting Defendants' Exhibit 10 to witness.)

"A This is a prospective of the proposed building to be built on the property.

"Q And is that a drawing, or picture of the building, which is partially portrayed in Exhibit 9? In other words, the two represent the same building?

"A These two represent the same building, yes.

"Q And Exhibit 10 was also prepared by your designer or architect?

"A That is right.

"Q At your request?

"A That is correct, sir.

"Q Now I notice that Exhibit 9—

"A This is the one here (indicating).

"Q The plan—

"A Uh-huh.

"Q —says, "street level." It apparently shows only the one level, is that correct?

"A That's right, sir.

"Q Was there a second sheet, representing the second floor?

"A We never got off the ground floor.

"Q Was there a plan, however? Did your architect, or designer, prepare a plan of the second floor?

"A Not to my recollection, sir.

"* * * * *

"A I stated to Mr. Lehman and Mr. Brickley, I must have lessees who had signed up for a five-year period, to meet the minimum requirements of the insurance company, which they stated they could do.

"Q They said they could do that?

"A Yes."

With reference to his purpose in procuring the preliminary drawings of the new building he testified:

"Q Well, doesn't an insurance company require plans before any kind of commitment will be made?

"A That is correct. That's why I went ahead and spent the money for preliminary floor drawings, so that I could give a sales aid to have Mr. Lehman sign up doctors. I went ahead on my own expense to pay for these things.

"Q That's why you ordered Defendants' Exhibits 9 and 10, the plan and colored picture?

"A That's right.

"Q So that you would have something to show the insurance company?

"A No, to show the lessees; not the insurance company.

"Q To show the lessees?

"A That is correct.

"Q You had every expectation then that the lessees before signing that—the tenants, before signing, would want to see it?

"A I think that is a logical explanation.

"Q In other words, a doctor is not going to sign a commitment to make a lease until he has a set of plans, so that he will know what he is getting himself into, isn't that correct?

"A That's right, sir.

"Q And that is why you ordered these plans, so that you could get the doctors signed up and the insurance company?

"A To the doctors, because the insurance company gets the plans and they will go along with the lines of the building. As long as the doctors or dentists have been signed up, so they have financial stability, they don't care what the building looks like.

"Q What plans were you talking about when you say Mr. Lehman and Mr. Brickley were seeing that they could get tenants? What plans were you talking about? Were you talking about plans to be later developed?

"A They were plans—we were talking about plans that would be acceptable to the doctors, and I knew I could meet the square footage requirements as long as Mr. Lehman and Mr. Brickley had the tenants. That was why I made this preliminary form. It was merely a rough draft of a form so that it could be changed to meet the doctors' or dentists' requirements.

"Q What are you referring to as preliminary?
"A That is the preliminary. It is not final (indicating Defendants' Exhibit 9.) That is known as a rough draft.

"Q So that when you were talking in the Satellite Cafe about the number of tenants that you would get, you were talking about the tenants that you could get on the plans that would be developed and drawn in the future?
"A Yes, that would be correct.

"Q You weren't talking about the plans they had, because they were not satisfactory to you, isn't that correct?
"A That is right, sir."

It is to be noted that the allegation in the complaint that defendants represented that they had eight tenants to occupy said structure when it should be completed is quite different from plaintiffs' testimony to the effect that the representation was that they would have no difficulty in obtaining eight tenants.

Plaintiffs' own testimony discloses that at the time the representation was made they would not accept the plans obtained by the defendants for the building to be constructed, but intended to substitute their own

plans at a later date; that under these circumstances no one would enter into a five-year lease of space in the building and they knew this, as shown by their testimony that they procured preliminary drawings for the purpose of showing them to prospective tenants who would not enter into a lease until they could see what they were "getting into."

■ It is clear to us that reasonable minds could reach only one conclusion, and that is, the statement made was solely one of opinion as to what could be accomplished in the future. This, of course, is not actionable fraud. Restatement, Contracts, ch 15, § 474, p 902.

As to plaintiffs' contention that they were misled into entering into the contract by the statement of defendants that they would bear the expense of removing the tenant, we merely note that subsequent to the execution of the agreement plaintiffs paid defendants $500 of the cost of removing the tenants with the understanding that this was to be deducted from the total purchase price and this was agreed to by the defendants.

We have in this opinion treated the named persons, Donald M. Lehman, and Larry Brickley as parties defendant since the court and parties treated them as such.

We have searched the record and are unable to find any evidence that either held any title to the real estate which is the subject of this action and could therefore under any theory be proper parties to this action.

For the above reasons the cause is reversed with instructions to enter judgment for the defendants.